FILED
04/27/2022
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 13, 2022

## ERIC TODD JACKSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Montgomery County**
**No. CC-17-CR-389, CC-15-CR-941, CC-15-CR-890 William R. Goodman, III,**
**Judge**

_____

**No. M2021-00302-CCA-R3-PC**

_____

The Petitioner, Eric Todd Jackson, appeals the denial of his petition for post-conviction relief and the denial of his Rule 36.1 motion to correct an illegal sentence, arguing that his guilty pleas to forgery and theft of property were unknowing and involuntary due to the ineffective assistance of counsel and that his sentence was illegal because he was innocent of the offenses. After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which John Everett Williams, P.J., and J. ROSS DYER J., joined.

Taylor R. Dahl, Clarksville, Tennessee (on appeal), and Adrienne Fry, Clarksville, Tennessee (at hearing), for the appellant, Eric Todd Jackson.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Senior Assistant Attorney General; Robert Nash, District Attorney General; and Lee Willoughby, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In 2017, the Defendant entered open nolo contendere pleas in the Montgomery County Circuit Court in Case Number 2015-CR-941 ("the forged checks case") to eight

counts of Class E forgery and one count of Class D theft of property.[1]  The forged checks were all drawn on the business account of the Petitioner's father, who operated an export logging business.  On September 1, 2017, the trial court sentenced the Defendant as a Range II, multiple offender to an effective term of six years at thirty-five percent release eligibility in the Tennessee Department of Correction.

On May 7, 2018, the Petitioner filed *pro se* petitions for post-conviction relief not only in the instant case but also in two subsequent cases, Case Numbers 2015-CR-890 and 2017-CR-389, in which he entered nolo contendere pleas to the burglary of his father's business and the aggravated assault of a police officer.  Among other claims, the Petitioner alleged that his pleas were unknowing and involuntary due to trial counsel's ineffective assistance.  With respect to the instant case, the Petitioner alleged that because trial counsel failed to provide him with discovery, the Petitioner was unaware that one of the forgery counts was based on a check that had been negotiated months before the Petitioner had forged any checks.  The Petitioner asserted that he would not have entered his pleas had he known.  Following the appointment of a series of post-conviction counsel, the Petitioner filed an amended petition on October 13, 2020, that incorporated by reference the allegations in his *pro se* petitions.

In the meantime, on September 4, 2020, the Petitioner filed a *pro se* Tennessee Rule of Criminal Procedure 36.1 motion to correct an illegal sentence, asserting that his sentences were illegal because his convictions were based on "crimes that ha[d] never taken place."

A combined evidentiary hearing was held on the Petitioner's post-conviction petitions and Rule 36.1 motions on November 11, 2020 and January 27, 2021.  Because the Petitioner was granted post-conviction relief in the aggravated assault and burglary cases, we will primarily review only the testimony that is relevant to the forged checks case.

The fifty-year-old Petitioner testified that he hired trial counsel, whom he had known for twenty-five years and who had represented him in other criminal cases, to represent him in the instant case and in the two subsequent cases.  He said that he and his father together made six separate visits to trial counsel's office to bring payments of the $12,000 that trial counsel charged them for his representation in the instant case.  According to the Petitioner, trial counsel talked about the case on only one of those six visits when trial counsel called the district attorney on speaker phone in the presence of the

---

[1]  We have relied on the post-conviction court's order for much of the background information about the cases, as neither the judgments nor the transcript of the guilty plea hearing were included in the record on appeal.

Petitioner and the Petitioner's father. Trial counsel told the district attorney that the Petitioner's father was prepared to place funds in an escrow account to reimburse Advance Financial, the bank that had suffered loss from the Petitioner's forging of his father's checks. The district attorney, however, expressed his intention of continuing with the prosecution regardless of whether the bank was made whole.

The Petitioner claimed that trial counsel never provided him with discovery or showed him copies of the forged checks. He said that trial counsel also failed to review the indictment with him, never discussed any defenses or potential expert witnesses, and did not review the sentences he could receive.

The Petitioner testified that approximately two months after he was sentenced in the forged checks case, he received a letter from the law firm that was pursuing loss recovery efforts on behalf of Advance Financial. He said the letter contained copies of seven, instead of eight, forged checks. The Petitioner identified the letter, which was admitted as an exhibit to the hearing. He said he mentioned the missing check to trial counsel because he knew he had a certain amount of time in which to withdraw his guilty plea, but trial counsel just said, "It's okay. It doesn't matter." The Petitioner stated that the Petitioner's father later obtained for the Petitioner a copy of the missing forged check, which had formed the basis for the Petitioner's plea in Count One.

The Petitioner testified that he was charged in Count One with forging his father's name to a $1,400 check on January 24, 2014. However, when he saw the check, which was made out to Nicole Taylor, he realized that he was not guilty of that count. The Petitioner then provided an involved explanation of how Nicole Taylor, a woman he had been dating, accompanied him when he went to East Tennessee to pick up some purchased logs from a man whose property was accessible only via an easement road that crossed a neighbor's property. The Petitioner said the neighbor required their logging company to pay for a temporary easement to bring their logging trucks over his land, and the Petitioner's father signed a blank check and gave it to the Petitioner to fill out with the proper name when the Petitioner reached the site and paid for the temporary easement. According to the Petitioner, the check went missing from his vehicle during his and Ms. Taylor's trip to East Tennessee. The Petitioner said he had no part in the check's being made out to and endorsed by Ms. Taylor, and that he assumed Ms. Taylor stole it from his vehicle.

The Petitioner also identified and introduced a letter from F&M Bank, where his father held the account on which the forged checks had been drawn. The letter stated that the Petitioner's father had placed stop payments on the checks that formed the bases for the Petitioner's forgery counts and that "No loss was suffered to the customer or F&M

- 3 -

Bank." The Petitioner expressed his belief that the letter "kind of thr[ew] a wrench" into the theft count, which was based on the cumulative value of the forged checks.

The Petitioner testified that he would not have entered his pleas had he known that he was not guilty in Count One and that F&M Bank had not suffered any loss. Instead, he would have gone to trial because he did not think any jury would have convicted him of a "fiction":

> I knew I did do some checks, but I knew I did not do Count One. I did not see it. The first time I seen it, my dad picked it up in December of 2017, three months after I took the time. I was already in prison.

> He sent me a copy and that kind of put suspicion on - - on [trial counsel] from that point on, because he lied to me. And just everything kind of got kicked - - this Count Nine, it - - it's purely fiction. It - - it never happened.

> If - - if you're saying that I - - I - - I took money out of the bank when every single check had a stopped payment, not a penny left [] the bank, that's what fiction is, ain't it?

With respect to the checks that he admitted to forging, the Petitioner testified that they were payroll checks that his cousin had taken from the logging business but "couldn't cash." The cousin gave the checks to the Petitioner, and the Petitioner cashed them in order to finance the Petitioner's "drug habit." The Petitioner stated that he thought his father would just "dock [his] paycheck" but his father instead placed stop payments on the checks, which was "why those charges rose." The Petitioner testified that he admitted that he had forged the checks when he was interviewed following his arrest.

The Petitioner repeated that trial counsel never shared discovery with him and that he was unaware of the pertinent facts in the case. He said he later learned that trial counsel had represented Nicole Taylor in 2016 and 2017 in two different cases. In the Petitioner's opinion, trial counsel's representation of Nicole Taylor created a conflict of interest, which trial counsel should have disclosed to him. The Petitioner identified five letters he had written to trial counsel after he was imprisoned for the instant case, which were admitted as a collective exhibit. He said trial counsel never responded to his letters.

The Petitioner claimed that his pleas in the burglary and aggravated assault cases were influenced by what he characterized as trial counsel's "lie" that the Petitioner would be released on parole by Christmas.

On cross-examination, the Petitioner said that he had been "pretty darn good" at school and had been offered a full scholarship to "Embry Riddle" in Cape Canaveral. He said he turned the scholarship down because his top pay as an Embry Riddle graduate would have been about $200,000, whereas he made $5,000,000 each year running the logging business, which his father had started sixty years earlier. The Petitioner stated that his father was the lifetime president of the business, but the business belonged to the Petitioner.

The Petitioner acknowledged that his father had repeatedly bailed him out of trouble throughout his adult life. He said he had been arrested over thirty-seven times and admitted that he had pled guilty in some of those cases. He stated that trial counsel reviewed discovery with him in those prior cases, unlike in the instant case. The Petitioner acknowledged that he had not reimbursed Advance Financial for its loss and said that he was waiting on the outcome of the instant case to do so. Finally, he testified that he lied during his plea colloquy when he indicated to the trial court that he was entering his pleas knowingly, intelligently and voluntarily. He said he had listened to his father, who told him it was in his best interest to enter the pleas.

The Petitioner's father, Charles Jackson, testified that he ran the logging business and was the only individual with the authority to sign the checks but that the business became the Petitioner's on the day that the Petitioner, his only son, had been born. He stated that he and the Petitioner met several times with trial counsel in connection with the instant case, but trial counsel never provided them with discovery and never reviewed anything about the case with them. He said he lost no money in connection with the forged checks and did not want the Petitioner prosecuted. He stated that he spoke with the district attorney three times about the case, showed him the check that had been made out to and endorsed by Nicole Taylor, and told him that the Petitioner was not guilty of that count. Each time, the district attorney told him that it made no difference. On cross-examination, he acknowledged that the Petitioner had stolen from him several times in the past.

The Petitioner's maternal half-brother, Wade Burrows, testified that he had a conversation about the plea deal with trial counsel as he, trial counsel, and the Petitioner's father were together in an elevator on the day that the Petitioner entered his pleas. He recalled that trial counsel told him that the Petitioner had been offered a good deal and that the Petitioner would probably be out on parole around Christmas time.

Trial counsel testified that he had been practicing law for thirty-one-years, with the last thirty years focused exclusively on criminal law as either a prosecutor or criminal defense attorney. He said that the Petitioner had a lengthy criminal history and that he had represented him over a period of years in a number of cases. He stated that the Petitioner was one of the most intelligent people he had ever met, had an extensive knowledge of the

criminal justice system, questioned him about what he was doing and the criminal process, and sometimes answered his own questions.

Trial counsel testified that it was his regular practice to give his clients copies of their discovery packets and that he would have done the same in the Petitioner's case. He had no specific memory of having reviewed the potential sentences with the Petitioner but expressed confidence that he would have done so. He recalled the State's having filed a range notice and his having corrected that notice to bring it down from a career to a multiple offender. He further recalled that the State's case against the Petitioner had been strong, with several eyewitnesses who were personally acquainted with the Petitioner prepared to testify that the Petitioner had negotiated the checks.

Trial counsel had some memory of the Petitioner's having objected to one of the checks that he had not negotiated. Trial counsel said he expressed to the prosecutor the Petitioner's desire for that count to be dismissed but the prosecutor was insistent that the Petitioner plead to all counts. Trial counsel agreed that he discussed with the Petitioner the advantages of the plea deal and that it would benefit the Petitioner at sentencing for the Petitioner to accept responsibility for his actions. In trial counsel's opinion, the Petitioner received a light sentence given his extensive criminal history. Trial counsel repeated that the Petitioner was "highly intelligent" and expressed his belief that the Petitioner fully understood his plea agreement.

On cross-examination by post-conviction counsel, trial counsel was unable to remember the specifics of conversations he had with the Petitioner or letters the Petitioner sent him. When asked if he would have made the Petitioner any promises about parole, he responded that he never made promises about anything but he was able to tell a client when the client would become eligible for parole.

With the post-conviction court's permission, the Petitioner was allowed to conduct further cross-examination of trial counsel himself. In response to the Petitioner's questions, trial counsel testified that he did think he knew Nicole Taylor. He did not dispute the Petitioner's assertion that he had represented Ms. Taylor on a traffic offense in 2016 to 2017, but he disagreed that such representation in an unrelated matter would have created a conflict of interest in the Petitioner's case.

On redirect examination, trial counsel agreed that the Petitioner's current sentence was the longest the Petitioner had ever been required to serve, as the Petitioner had always received probation in his prior cases. He testified that the Petitioner's father "was a loving man with a lot of money" who had "done a lot of fixing over the years."

On February 22, 2021, the post-conviction court entered an order in which it summarily denied the Petitioner's Rule 36.1 motions to correct his illegal sentences on the

- 6 -

basis that they failed to state colorable claims for relief. The court granted the Petitioner's petitions for post-conviction relief in the burglary and aggravated assault cases but denied it in the instant case, finding that the Petitioner failed to show by clear and convincing evidence that he was denied the effective assistance of counsel or entered unknowing and involuntary guilty pleas.

## ANALYSIS

The Petitioner contends that the post-conviction court erred in denying his petition for post-conviction relief and his 36.1 motion to correct the illegal sentence. The State responds by arguing that the post-conviction court properly denied the post-conviction petition on the basis that the Petitioner was unable to meet his burden of demonstrating ineffective assistance of counsel or unknowing and involuntary guilty pleas and properly denied the Rule 36.1 motion on the basis that the Petitioner's claim of actual innocence does not establish a colorable ground for Rule 36.1 relief. We agree with the State.

### I. 36.1 Motion

With respect to his 36.1 motion, the Petitioner contends that his sentence is illegal because "he is actually innocent of the crimes to which he entered a plea, most specifically those referenced in Count One and Count Nine of the indictment returned against him."

Rule 36.1 provides "a mechanism for the defendant or the State to seek to correct an illegal sentence." *State v. Brown*, 479 S.W.3d 200, 208-09 (Tenn. 2015). An illegal sentence is defined as "one that is not authorized by the applicable statutes or that directly contravenes an applicable statute." Tenn. R. Crim. P. 36.1(a). When a defendant files a motion under Rule 36.1, the trial court must determine whether the motion "states a colorable claim that the sentence is illegal." Tenn. R. Crim. P. 36.1(b). In the context of Rule 36.1, a colorable claim is a claim that, "if taken as true and viewed in a light most favorable to the moving party, would entitle the moving party to relief under Rule 36.1." *State v. Wooden*, 478 S.W.3d 585, 593 (Tenn. 2015). Whether a motion "states a colorable claim for correction of an illegal sentence under Rule 36.1 is a question of law, to which de novo review applies." *Id.* at 589.

The Petitioner's actual claim of innocence does not render his sentences illegal. We, therefore, conclude that the post-conviction court properly denied the motion for failing to state a colorable claim for Rule 36.1 relief.

### II. Post-Conviction Claims

- 7 -

With respect to his post-conviction claims of ineffective assistance of counsel and unknowing, unintelligent, and involuntary guilty pleas, the Petitioner contends that trial counsel was deficient for, among other things, failing to make a reasonable investigation, which would have resulted in the discovery that the Petitioner was not guilty of Count One and that "no loss was actually suffered" in Count Nine. The Petitioner asserts that, had he known the facts surrounding those counts, he would not have pled guilty but would have insisted on proceeding to trial.

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Wiley v. State*, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. *Id.* However, review of a post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).

The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he would not have pled guilty but would instead have insisted on proceeding to trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *House v. State*, 44 S.W.3d 508, 516 (Tenn. 2001).

When analyzing a guilty plea, we look to the federal standard announced in *Boykin v. Alabama*, 395 U.S. 238 (1969), and the state standard set out in *State v. Mackey*, 553 S.W.2d 337 (Tenn. 1977). *State v. Pettus*, 986 S.W.2d 540, 542 (Tenn. 1999). In *Boykin*, the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. *Boykin*, 395 U.S. at 242. Similarly, our Tennessee Supreme Court in *Mackey* required an affirmative showing of a voluntary and knowledgeable guilty plea, namely, that the defendant has been made aware of the significant consequences of such a plea. *Pettus*, 986 S.W.2d at 542.

A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is "knowing" by questioning the defendant to make sure he or she fully understands the plea and its consequences. *Pettus*, 986 S.W.2d at 542; *Blankenship*, 858 S.W.2d at 904. Because the plea must represent a voluntary and intelligent choice among the alternatives available to the defendant, the trial court may look at a number of circumstantial factors in making this determination. *Blankenship*, 858 S.W.2d at 904. These factors include: (1) the defendant's relative intelligence; (2) his familiarity with criminal proceedings; (3) whether he was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against him and the penalty to be imposed; and

(5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. *Id.* at 904-05.

In denying the petition, the post-conviction court, obviously accrediting the testimony of trial counsel, found that the Petitioner was a man of at least average to above average intelligence who was familiar with the criminal justice system and was likely motivated to enter his pleas in order to avoid a greater penalty in a jury trial. The court noted that the Petitioner acknowledged he had forged seven of the eight checks and observed that the Petitioner was mistaken in his belief that no crime occurred merely because his father did not want him prosecuted and neither his father nor his father's bank suffered any loss as a result of the Petitioner's actions. Accordingly, the post-conviction court found that the Petitioner failed to meet his burden of showing that he was denied the effective assistance of counsel or that his pleas were not knowing, intelligent, and voluntary.

The record supports the findings and conclusions of the post-conviction court. As we have previously observed, the Petitioner failed to include the transcript of the guilty plea hearing in the record on appeal. *See* Tenn. R. App. P. 24(b) (providing that it is the appellant's duty to prepare a fair, accurate, and complete record on appeal to enable this court to conduct a meaningful review). However, the Petitioner acknowledged in his evidentiary hearing testimony that he had assured the trial court that he was entering his pleas knowingly and voluntarily. For his part, trial counsel testified that the Petitioner was one of the most intelligent people he had ever met, that the Petitioner was well-versed in the criminal justice system, and that the Petitioner regularly asked him questions and at times even answered his own questions. Trial counsel was confident that he provided a copy of the discovery packet to the Petitioner and that he reviewed with him the possible sentences. Trial counsel was equally confident that the Petitioner understood the plea agreement and entered his pleas knowingly and voluntarily.

Although trial counsel's memory was not as strong on this point, he also recalled the Petitioner's having expressed initial reluctance to pleading to one of the forgery counts and the prosecutor's having insisted that the plea deal required the Petitioner to plead to all counts of the indictment. The Petitioner's insistence that no crime occurred because neither his father nor his father's bank suffered any financial loss ignores the fact that Advance Financial, where the Petitioner or his girlfriend cashed the checks, is out the cash that the Petitioner, by his own testimony, received and used to finance his drug habit. We, therefore, conclude that the post-conviction court properly found that the Petitioner failed to meet his burden of proving his post-conviction claims of ineffective assistance of counsel and unknowing and involuntary guilty pleas.

## CONCLUSION

Based on our review, we affirm the judgment of the post-conviction court denying the petition for post-conviction relief and the Rule 36.1 motion to correct an illegal sentence.

_____
JOHN W. CAMPBELL, SR., JUDGE